UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Philip Tricoli
                              Plaintiff,


                                                    **Hon. Hugh B. Scott**

                    v.                                 11CV379S

                                                         **Report
                                                           &
                                                    Recommendation**

County of Erie, et al.
                              Defendants.


          Before the Court is the defendants' motion for summary judgment (Docket No. 29).


                              **Background**

          The plaintiff, Philip Tricoli ("Tricoli") commenced this action against the County of Erie

and the County of Erie Department of Public Works, Division of Highways (referred to

collectively as "the defendants" or "the County") under the Age Discrimination in Employment

Act ("ADEA").  Tricoli started working for Erie County in 1993, and has worked there as a

Motor Equipment Operator ("MEO") since 2004, and is over the age of 40. (Docket No. 1 at

¶¶12, 24). On June 30, 2008, the plaintiff applied for the posted position of temporary blacksmith

in the Aurora Plant. (Docket No. 1 at ¶ 13).  Tricoli contends that he was the most senior

qualified applicant for the position. (Docket No. 1 at ¶¶ 15-17).  The County, instead, awarded

the position to Kevin Glenn ("Glenn"), a younger, less senior applicant. (Docket No. 1 at ¶ 18).[1]

Tricoli also asserts that Glenn was offered the opportunity to perform out-of-title work in the

blacksmith's position allowing him to increase his qualifications for the temporary blacksmith

position, while the plaintiff was not afforded that opportunity. (Docket No. 1 at ¶ 25).


### Discussion

The defendants have moved for summary judgment claiming that the plaintiff cannot

demonstrate that he was qualified for the temporary blacksmith position.  The defendants also

assert that they have articulated a legitimate, non-discriminatory reason for not appointing Ticoli

to the temporary blacksmith position. Finally, the defendants argue that the plaintiff cannot

maintain his claims for emotional distress and punitive damages under the ADEA.


### Standard of Review

Summary Judgement

Summary judgment is appropriate where there are no issues of material fact in dispute,

and the moving party is entitled to judgment as a matter of law.  See Trans Port, Inc. v. Starter

Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992) (citing Bryant v. Maffucci, 923 F.2d 979, 982

(2d Cir. 1991).  The Court must draw all reasonable inferences in favor of the non-moving party

and grant summary judgment only if no reasonable trier of fact could find in favor of the non-

moving party.  See Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991); Howley v. Town of

---

[1]   Five individuals applied for the temporary blacksmith position: Tricoli, Glenn, Ralph
Bevilacqua ("Bevilacqua"), Daniel Lach ("Lach"), and Adam Charles ("Charles"). (Docket No.
31-4).

Stratford, 217 F.3d 141 (2nd Cir. 2000).  However, the non-moving party must, "demonstrate to

the court the existence of a genuine issue of material fact."  Lendino v. Trans Union Credit

Information, Co., 970 F.2d 1110, 1112 (2d Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S.

317, 324 (1986)). A fact is material:

> when its resolution would "affect the outcome of the suit under the
> governing law" and a dispute about a material fact is genuine "if
> the evidence is such that a reasonable jury could return a verdict
> for the non-moving party."

General Electric Company v. New York State Department of Labor, 936 F.2d 1448, 1452 (2d

Cir. 1991) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "The non-

moving party must come forward with enough evidence to support a jury verdict . . . and the . . .

motion will not be defeated merely . . . on the basis of conjecture or surmise."  Trans Sport, 964

F.2d at 188 (citing Bryant v. Maffucci, 923 F.2d at 982).  If undisputed material facts are

properly placed before the court by the moving party, those facts will be deemed admitted, unless

they are properly controverted by the non-moving party."  Glazer v. Formica Corp., 964 F.2d

149, 154 (2d Cir. 1992) (citing Dusanenko v. Maloney, 726 F.2d 82 (2d Cir. 1984).  The Court's

responsibility in addressing a summary judgment motion is identifying factual issues, not

resolving them.  See Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 528 (2d Cir.

1990).  However, summary judgment is appropriate "[w]here the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party." Nippon Fire & Marine Ins. Co.,

Ltd. v. Skyway Freight Systems, Inc., 235 F.3d 53 (2d Cir. 2000) (quoting Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Age Discrimination Claims

In assessing ADEA claims, the Court applies the burden shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973), and Gross v. FBL Financial Services, 557 U.S. 167, 177-180 (2009). Under that framework, a plaintiff must satisfy the minimal burden of making out a prima facie case of discrimination; the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions; and the final burden rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual but also that the defendant discriminated against the plaintiff. Gross makes it clear that "a plaintiff bringing a discrimination claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action" and not just a contributing or motivating factor. Gross, 557 U.S. at 180.  To establish a *prima facie* case of discrimination under either the ADEA, a plaintiff must show "(1) that [he] was within the protected age group, (2) that [he] was qualified for the position, (3) that [he] experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." Spataro v. Glenwood Supply, 479 Fed.Appx. 403 (2d. Cir. 2012) quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 107 (2d Cir.2010). See also Carlton v. Mystic Transp., Inc.,  2000 WL 95036 (2nd Cir. 2000)(same).

There does not appear to be a dispute in this case that the plaintiff was within the protected age group.

4

<u>Minimum Qualifications for Temporary Blacksmith Position</u>

The defendants argue that Tricoli did not meet the minimum qualifications for appointment to the temporary blacksmith position, and thus, cannot establish a prima facie case under the ADEA. According to Gary M. Zawodzinski, the Senior Highway Maintenance Engineer in the Department of Public Works, Clarence District ("Zawodzinski"), John F. Zabawa, then Senior Highway Maintenance Engineer in the Aurora District ("Zabawa"), posted a notice of vacancy for the [2] temporary blacksmith position on June 30, 2008.  Pursuant to the job posting, the minimum qualifications included "one (1) year of experience performing blacksmith duties as indicated above." (Docket No. 31-1 at page 2). The job posting described the blacksmith "work activities" to include:

> Makes and repairs snow plow wings and blades;
> Sharpens and tempers hand and machine tools such as picks; crowbars, rock drills, punches, cold chisels and stone wedges;
> Bends, draws, forges and welds various grades of iron and steel;
> Hardens and tempers steel for parts of automobiles, trucks, tractors and construction equipment;
> Forges metals such as in replacing links in chains and replacing hooks on cables;
> Shapes reinforcement steel for concrete bridges in accordance with specifications;
> Replaces metal and wooden handles in tools; ·
> Assists in the repair and replacement of truck springs;
> Repairs and installs hydraulic systems;
> Performs a variety of related tasks.

(Docket No. 31-1 at page 2).  The job description also calls for "Full Performance Knowledge, Skills, Abilities and Personal Characteristics: Good knowledge of the common practices, tools,

---

[2]  Zawodzinski states that a "temporary" title is not a training position and that to be appointed even to a temporary position, a candidate must meet all of the minimum qualifications. (Docket No. 31 at ¶¶ 11-12).  According to Tricoli, you need to be a temporary blacksmith for one year prior to becoming a permanent blacksmith. (Docket No. 42-1 at page 9-12).

terminology and safety precautions of the trade; good knowledge of acetylene and electric

welding; ability to work from plans and specifications; ability to understand and follow oral and

written instructions; good motor, hand and eye coordination; physical strength and endurance;

physical condition commensurate with the demands of the position." (Docket No. 31-1 at page

2).


Tricoli

The record reflects that Tricoli's application consisted of a single-page form on which the

plaintiff indicated his past relevant work being his experience as a "meat specialist" for "Peter J.

Schmitt" from 1969 to 1992; and his work as an MEO the County.[3]   With respect to how his

MEO duties were relevant to the temporary blacksmith position, Tricoli stated: "work with

Blacksmith putting on and removing sanders, putting on shoes and blades; putting on wing cable;

hooking up Hyd.[4]"  (Docket No. 31-2).  At his deposition, Tricoli described his role in assisting

the blacksmiths as follows:

> Whatever was requested of me, tightening down bolts. Sometimes
> handing them tools when they were underneath the truck. Helping
> them hold things while things were being bolted. You know,
> whatever the job required. You know, if – you know, they would
> sometimes give you – set you up and tell you this is what you had

---

[3]   At his deposition, Tricoli testified that he worked for Peter J. Scmitt as a meat cutter
from 1969 to 1992. After he left Peter J. Schmitt in 1992, he was hired by Erie County to work in
the Home Energy Assistance Program ("HEAP") and then was assigned to the senior services
department, until he started with the highway department on April 19, 1993. His initial position
with the highway department was that of a laborer, which he held until the late 1990s when he
was promoted to MEO.  (Docket No. 42-1 at pages 26-31).

[4]   According to Tricoli's deposition testimony, this is an abbreviation for "hydraulic
lines." (Docket No. 42-1 at page 45, 112).

> to do and you would do it. You know, I had experience working on
> equipment. It is – everything – if there is someone there to instruct
> you, there wasn't anything I wasn't able to do.

(Docket No. 42-1 at page 44).  Tricoli testified that he also had experience welding when

assisting the blacksmiths.  The plaintiff states that he did some "stick welding on buckets" on

three or four occasions under the supervision of the blacksmiths. (Docket No. 42-1 at pages 45-

47).  In addition, Tricoli stated that in replacing plow blades, he was required to "burn out" the

bolts, put new bolts in and then "tack weld" the new bolt in place. (Docket No. 42-1 at page 50).

Tricoli further testified that he also had some experience performing "mig" welding on drainage

grates, again under the supervision of one of the blacksmiths. (Docket No. 42-1 at pages 53-63).

Finally, Tricoli testified that in assisting the blacksmith he also performed tasks including cutting

metal with a torch, and  grinding surfaces to prepare them for welding. (Docket No. 42-1 at pages

72-73).  Tricoli acknowledged that at the time he applied for the temporary blacksmith position,

he had less than one year of actual welding experience. (Docket No. 42-1 at page 113).  Tricoli

estimated that at the time he applied for the temporary blacksmith position he had approximately

three months of actual welding experience and had not taken any training courses outside of

work to learn how to weld or perform the blacksmith's tasks.[5]  (Docket No. 42-1 at pages 114-

115).  Notwithstanding, Tricoli stated that he was qualified for the position because his

qualifications were better than many of the blacksmiths who had no welding experience prior to

---

[5]   With respect to some of the other blacksmith's tasks listed on the temporary
blacksmith job posting, Tricoli testified that he has had experience sharpening tools, but does not
know what it means to "temper" anything (Docket No. 42-1 at page 175); that he has had some
experience bending metal (Docket No. 42-2 at page 176); he has had no experience hardening or
tempering steel (Docket No. 42-2 at page 179); that he has replaced metal and wooden handles
on tools many times (Docket No. 42-2 at page 180); and that he has assisted in repairing and
installing hydraulic systems, but had never done so himself (Docket No. 42-2 at pages 181-182).

being appointed to the blacksmith's position.[6]  (Docket No. 42-1 at page 117).  Tricoli stated that

even though the posting listed certain "minimum qualifications," he did not understand the

posting as requiring those qualifications because the County did not require those qualifications

in the past. (Docket No. 42-1 at page 143).  He believed that he should have been given the

opportunity "[b]ecause I was the most senior person and ... this was my time and I felt that I paid

my dues as much or more than others in the past." (Docket No. 42-1 at page 132).  Tricoli also

acknowledged that Glenn already had welding experience at the time he was hired as a temporary

blacksmith, but did not know if Glenn had welding experience outside of that which he

accumulated while working as an MEO. (Docket No. 42-1 at pages 124-126).

    When he advised Zabawa that he wanted the temporary blacksmith position Zabawa did

not inquire about Tricoli's qualifications or ask if he could weld. (Docket No. 42-1 at pages 109-

110).  The plaintiff acknowledged that Zawodzinski "may have mentioned" that Tricoli did not

list any welding experience on his application.[7] (Docket No. 42-2 at page 200).  During a

subsequent conversation which Tricoli states took place in an area they referred to as "the barn,"

Zawodzinski allegedly told Tricoli that the temporary blacksmith job was "physically

demanding," questioned Tricoli's age and ability to handle the work demands of the job, and

---

[6]  Tricoli testified that he believed that Russ Holly and Russ Riggio had been appointed
to temporary blacksmith positions without welding experience. (Docket No. 42-1 at pages 118-
125).

[7]  Initially, the plaintiff testified that Zawodzinski said this to him sometime between the
time Tricoli submitted his application and the appointment of Glenn, but later stated that it could
have happened "closer to the time that Glenn was appointed" or "maybe after." (Docket No. 42-2
at page 200).  Still later in the deposition, Tricoli testified that Zawodzinski may have mentioned
his failure to list any welding experience during conversations both before and after Glenn's
appointment. (Docket No.  42-2 at page 233).

stated that he wanted to "go with younger people." (Docket No. 42-2 at page 210).[8]  A week or two after the conversation in the barn area, Tricoli testified that Zabawa called Tricoli in his office and advised him that Zawodzinski was not going to give him the temporary blacksmith job. (Docket No. 42-2 at page 201).  During that meeting,  Zabawa also asked Tricoli how old he was and when he would be retiring. Tricoli stated that he responded by advising Zabawa that he was 57 (at that time) and that he would retire when he could afford to retire.  Tricoli testified that Zabawa stated that he did not realize that Tricoli was that old. (Docket No. 42-2 at page 202). According to Tricoli, Zabawa advised him that he wanted Tricoli to get the job, but that Zawodzinski made Zabawa change his recommendation. (Docket No. 42-2 at page 202).

Glenn was officially appointed to the temporary blacksmith position on October 11, 2008. (Docket No. 31 at ¶29).[9]  Tricoli testified that Bevilacqua and Glenn told him that they heard Zawodzinski say that Zawodzinski wanted Glenn because he thought Tricoli was going to retire soon. (Docket No.  42-2 at page 275). Tricoli testified that he believed that his qualifications were equal to Glenn's except for the opportunities that Glenn was provided to perform out-of-title blacksmith work in August, September and October of 2008. (Docket No.  42-2 at page 285).

---

[8]    Tricoli states that Bevilacqua, Glenn, Zabawa, Tim Wrobel ("Wrobel"), Darien Vandewalker, Todd Domster, and Adam Charles were all present when Zawodzinski made these comments, but that only himself, Zawodzinski, Glenn, Bevilacqua, Zabawa and Wrobel were part of the conversation.  (Docket No. 42-2 at page 211-214).

[9]    After Glenn was appointed to the temporary blacksmith position, Tricoli filed a grievance, which was denied based upon the plaintiff's lack of welding experience. (Docket No. 42-2 at page 241-244).

Zawodzinzki

Zawodzinski was Deputy Commission for the Erie County Highway Department from 2008 until 2012 – the relevant time frame relating to the plaintiff's claims in this case. (Docket No. 42-17 at page 12). He was able to make hiring and promotional decisions, subject to approval by the County Personnel Department. (Docket No. 42-17 at page 18). Zawodzinski testified that he first learned of the temporary blacksmith vacancy when paperwork from Zabawa arrived on his desk. (Docket No. 42-17 at page 50). He stated that he reviewed Zabawa's recommendation of Tricoli (Docket No. 31-4) and called Zabawa to tell him that he did not agree with the recommendation. (Docket No. 42-17 at page 51). Zawodzinski stated that based upon the temporary blacksmith job description, welding was a "key aspect" for the position, and that any candidate had to have sufficient welding experience. (Docket No. 31 at ¶ 18). He testified that he believed that welding was the most important duty of a blacksmith "because we send 60,000 pound trucks down the road ... with plows and wings hanging off the trucks going 30, 40 miles an hour ... and if something breaks off and hits a car or hits a person, it would be a travesty." (Docket No. 42-17 at page 73). According to Zawodzinski, Tricoli's application did not identify any actual experience relevant to the temporary blacksmith potion. (Docket No. 34 at ¶ 30).[10] Zawodzinski acknowledged that Glenn's written application did not list how Glenn met the minimum qualifications for the temporary blacksmith job, but he stated that he knew about Glenn's qualifications from having Glenn assist blacksmiths on other occasions. (Docket No. 42-17 at pages 61-63). Zawodzinski stated that Tim Wrobel, the blacksmith at the East Aurora

---

[10]   Zawodzinski asserts that after Glenn was appointed, Tricoli admitted to Zawodzinski that he could not weld. (Docket No. 42-17 at page 81).

location, had told Zawodzinski that Glenn knew how to weld and that based upon that information and "other things" that he knew about Glenn, he concluded that Glenn met the minimum qualifications. (Docket No. 42-17 at page 64).  Zawodzinski stated that after speaking with Zabawa regarding Tricoli's application, he determined that Zabawa had recommended Tricoli "solely on the fact that [Tricoli] was the most senior applicant for the position" and that Zabawa did not consider whether the candidates met the minimum qualifications for the position (Docket No. 31 at ¶¶ 23-24).[11]  Zawodzinski directed Zabawa to go back and inquire whether the other candidates had welding experience. (Docket No. 42-17 at page 53).  According to Zawodzinski, Zabawa subsequently advised Zawodzinski that only Glenn and Adam Charles (the least senior candidate) could weld. (Docket No. 42-17 at page 67). Zawodzinski told Zabawa  to give the position to Glenn. (Docket No. 42-17 at pages 58-59, 71).  Zawodzinski acknowledged that he directed Zabawa to change his recommendation to recommend Glenn for the position. (Docket No. 42-17 at page 71).  Zawodzinski stated that he does not recall a group discussion in the barn area involving himself, Tricoli and Bevilacqua regarding Tricoli's application for the temporary blacksmith position, and denied expressing concern about Tricoli's age, or physical ability to do the job. (Docket No. 42-17 at page 91-98).  Zawodzinski stated that he never had a conversation with anyone, other than Zabawa, about Glenn getting the appointment. (Docket No. 42-17 at page 100).

---

[11]   Zawodzinski testified that in 2008 he had also disagreed with the "recommendation" of another individual, Hoot Gibson, an MEO who had applied for a temporary blacksmith position in the Hamburg location, based upon Gibson's lack of welding experience. (Docket No. 42-17 at page 33).  Zawodzinski does not state who recommended Gibson, and instead states that Dave Boehm, the district engineer at the Hamburg location, had recommended someone else. (Docket No. 42-17 at page 34).

Zabawa

Zabawa was the district engineer of the highway department's East Aurora location during the time period involving the posting of the temporary blacksmith position. (Docket No. 42-5 at page 13).  Zabawa stated that it was his decision to post the temporary blacksmith vacancy. (Docket No. 42-5 at page 20). Those interested in the position filled out the County's standard application form and submitted the forms to Zabawa.  Zabawa then forwarded the paperwork "downtown." (Docket No. 42-5 at pages 20-23). Zabawa stated that he did not recall how long Glenn's application was, but noted that it was common for candidates to attach additional information to the application forms. (Docket No. 42-5 at page 40).  Zabawa testified that he initially recommended Tricoli for the temporary blacksmith position. (Docket No. 42-5 at page 24).[12]  Zabawa acknowledged that he never asked Tricoli if he had any welding experience. (Docket No. 42-5 at page 88). He testified that after he recommended Tricoli, Zawodzinski told him that he did not believe Tricoli was qualified for the temporary blacksmith position. (Docket No. 42-5 at page 25). Zabawa stated that he advised Zawodzinski that he thought Tricoli would "give one hundred percent;" that "the next guy down" [Bevilacqua] was going to be a temporary mechanic; and that Lach did not really seem interested in the job.  (Docket No. 42-5 at page 26). Zabawa testified that Zawodzinski noted that Glenn was already "back there" doing blacksmith work out-of-title, but Zabawa does not recall Zawodzinski stating that he wanted to hire Glenn

_____

[12]   Zabawa stated that seniority was the most important factor in a job promotion. When asked the if there were two candidates, "A" and "B", where "A" is senior and meets the minimum qualifications, but "B" is way more qualified; Zabawa stated that "A" should get the job even though "B" was more qualified. (Docket No. 42-5 at page 80).

for the position at that time.[13] (Docket No. 42-5 at pages 26-27; 33).  With respect to Tricoli, Zabawa stated that Zawodzinski "just really wasn't, you know, keen on [Tricoli] getting it and I don't know why to be honest." (Docket No. 42-5 at page 27). Zabawa stated that he suggested to Zawodzinski that both Tricoli and Glenn be made temporary blacksmiths. (Docket No. 42-5 at page 32).  Zabawa testified that Zawodzinski *did not* make any comments to him about Tricoli's age, retirement plans or his ability to the perform heavy work of a temporary blacksmith at any time. (Docket No. 42-5 at page 27-28). In a subsequent conversation, Zawodzinski advised Zabawa that Tricoli "was out" and that he wanted Glenn for the position. He testified that Zawodzinski instructed Zabawa to make out a revised recommendation in favor of Glenn for the temporary blacksmith position. (Docket No. 42-5 at page 34-36).  Zabawa also recalled a group discussion with Zawodzinski and others, but did not recall Zawodzinski asking Tricoli about his age or retirement plans. (Docket No. 42-5 at page 50-52).  Zabawa acknowledged that he met with Tricoli and Bevilacqua to advise Tricoli that he was not going to get the temporary blacksmith position, and that at that meeting he asked Tricoli his age and retirement plans. (Docket No. 42-5 at page 56).  Zabawa denied that he asked Tricoli those questions because of anything Zawodzinski had said. (Docket No. 42-5 at page 57).  Zabawa stated that the only reason Zawodzinski gave him for not appointing Tricoli was that he was "not giving the job to a meat cutter." (Docket No. 42-5 at page 57). Zabawa stated that he did not provide Glenn an opportunity to work out-of-title as a blacksmith to make him a better candidate for the temporary

---

[13]   Zabawa testified that Glenn was already doing out-of-title blacksmith work before the temporary blacksmith position vacancy was even posted. (Docket No. 42-5 at page 29).  Zabawa believes that he offered the out-of-title work to "a group" and "telling everyone the door was open" but does not recall asking Tricoli specifically. (Docket No. 42-5 at page 30).

blacksmith position at Zawodzinski's direction. (Docket No. 42-5 at page 74; 77-78). Zabawa acknowledged that welding is an important and specialized skill and that people can get killed if a weld is not done properly. (Docket No. 42-5 at page 75). According to Zabawa, a temporary position is not supposed to be a "training" position and that the temporary blacksmith is supposed to be able to "step right in". (Docket No. 42-5 at page 76). Notwithstanding, Zabawa stated that it often is a training position and that "a lot of them learn on the job." (Docket No. 42-5 at page 76).

Glenn

The record also includes the deposition testimony of Glenn.  He testified that he started working as a laborer for Erie County in 1999 and that he became a permanent MEO at the East Aurora location in 2004. (Docket No.  42-3 at page 14).[14]  Glenn was asked about the minimum qualifications listed in the job posting for the temporary blacksmith position. He stated that he had experience welding while assisting blacksmiths while working as an MEO. (Docket No.  42-3 at page 27).  At the time he applied for the temporary blacksmith position, Glenn stated that he had one year of experience in replacing, but not making, snowplow wings and blades; he had one year experience in sharpening and tempering hand and machine tools; he had one year of experience in bending, drawing, forging, welding various grades of iron and steel; he had one year of hardening, and tempering steel for parts of automobiles, trucks, tractors and construction equipment; he had one year of experience replacing metal and wooden handles in tools; he had

---

[14]   Between 2005 and 2007, due to layoffs, Glenn was "bumped" back down to a laborer's position. (Docket No.  42-3 at page 14).

one year of experience in assisting in the repair and replacement of truck springs; he had one year of experience in repairing and installing hydraulic systems.  He did *not* have one year of experience in forging metals such as replacing links and chains and replacing hooks on cables; he did *not* have one year of experience shaping reinforcement steel for concrete bridges.  (Docket No. 42-3 at pages 62-63).  In addition to the experience he obtained as an MEO for the County, Glenn stated that between 1997 and 1999, he worked at Terry Young's Auto Plaza as a mechanic doing classic car restoration (Docket No. 42-3 at page 13).  Glenn stated that he performed both arc welding and "mig" welding while working at Terry Young's in connection with body panel replacement and floor panel replacement projects. (Docket No. 42-3 at page 13). He stated that he also had experience with truck springs and hydraulics while working at Delta Sonic car wash facility. (Docket No. 42-3 at page 63).  Glenn testified that he submitted an attachment with his application for the temporary blacksmith position describing the work he performed as a mechanic at Terry Young's. (Docket No. 42-3 at page 36). Glenn stated that while he was an MEO he worked out-of-title as a mechanic and blacksmith. (Docket No. 43-3 at page 26). According to Glenn, he was asked to work-out-of-title as a blacksmith in August of 2008 by Ron Broska, the general foreman of the highway department at the East Aurora location. (Docket No. 42-3 at pages 27-28).  Glenn stated that Broska asked him to work-out-of-title as a blacksmith because Glenn showed an interest in the work. (Docket No. 42-3 at page 29).[15]  Glenn acknowledged that he thought Tricoli would get the temporary blacksmith job because Tricoli

---

[15]   Glenn stated that Tricoli should have been asked if he wanted the out-of-title work because Tricoli had the most seniority. (Docket No. 42-3 at pages 29-30).  Glenn also testified that he had to file a grievance to get the additional pay for working out-of-title. (Docket No. 42-3 at pages 69-70).

had more seniority than he did. (Docket No. 42-3 at page 41). Shortly after being appointed to

the temporary blacksmith position, Glenn stated that he asked Zabawa why he was selected

instead of Tricoli. According to Glenn, Zabawa stated that "he had no control over it." (Docket

No. 42-3 at page 47). Glenn stated that Zabawa never told Glenn that Tricoli's age or retirement

plans factored into the decision. (Docket No. 42-3 at page 48).[16]   When asked why he believed

Tricoli did not receive the appointment, Glenn stated that he believed that Zawodzinski "did

what he could to get somebody the position other than [Tricoli], either younger or more

qualified." (Docket No. 42-3 at page 89).

According to Glenn, the duties of a temporary blacksmith include "forging steel,

sharpening blades, welding equipment, replacing hydraulic lines, changing parts depending on

what is broken, maintaining proper working order of plows and snow removal equipment and

salters for ice and snow control." (Docket No. 42-3 at page 18). Glenn testified that there was

no difference between the job duties of a temporary blacksmith and a permanent blacksmith.

(Docket No. 42-3 at page 18). After being appointed to the temporary blacksmith position at the

East Aurora location, Glenn transferred to the Harlem Road location as a permanent blacksmith.

(Docket No. 2-3 at page 15). Glenn testified that working as a blacksmith for the County

requires him to perform welding two or three days a week.[17]   On those days, he would only spend

part of the day, not the majority of the day, welding. Smaller projects would require two hours of

---

[16]   Glenn did state that he heard Zawodzinski ask Tricoli if he was going to retire soon during the heated discussion that involved Tricoli, Zawodzinski, Bevilacqua, and others in the barn area prior to Glenn's appointment to the temporary blacksmith job. (Docket No. 42-3 at page 51-54).

[17]   Glenn testified that he completed the Erie 1 BOCES welding program in the summer or fall of 2009. (Docket No. 42-3 at page 11).

welding; bigger jobs – which occurred approximately twice per month – would require four to

six hours of welding in a day. (Docket No.  42-3 at pages 23-24).

Bevilacqua

Bevilacqua, one of the candidates for the temporary blacksmith position and the union

steward, also testified regarding the conversation between himself, Tricoli, Zawodzinski and

Zabawa at "the barn."  According to Bevilaqua, during that conversation Zawodzinski made

"sarcastic" statements such as "I am not going to give ... a blacksmith job to a meat cutter."

(Docket No. 42-4 atpage 24). Bevilacqua testified that he and Zawodzinski had a heated

discussion during which Zawodzinski stated that he did not want to put the time and effort into

giving Tricoli the blacksmith's job because Tricoli was "too old" and would retire in a few years.

(Docket No. 42-4 at pages 24-25; 27-29; 31).  Bevilacqua stated that he had at least five

conversations with Zawodzinski regarding the temporary blacksmith appointment in which

Zawodzinski told Bevilacqua that Zawodzinski would not give the job to Tricoli because he

thought Tricoli was going to retire soon. (Docket No. 42-4 at pages 31-32).  Bevilacqua testified

that Glenn was selected for the position because Glenn is a "kiss ass"[18] who would do anything

that Zawodzinski wanted done without pay beyond his regular pay (Docket No. 42-4 at pages

104-106). Bevilacqua stated that Zawodzinski also wanted to put someone in that position who

was going to be there for fifteen to twenty more years. (Docket No. 42-4 at page 108).

---

[18]   Bevilacqua apologized for calling Glenn a "kiss ass" stating that doing so was
"uncalled for." (Docket No. 42-4 at page 109).

Prima Facie Case

As noted above, to establish a prima facie case in this matter the plaintiff must demonstrate that he was qualified for the temporary blacksmith position.  The defendants contend that the plaintiff cannot do so because he cannot demonstrate the requisite welding experience.  The defendants assert that the plaintiff's application did not contain any documentation or information demonstrating his qualification for the temporary blacksmith position. (Docket No. 30 at page 7, 11).

There does not appear to be a factual dispute as to the fact that Tricoli did not have "one (1) year of experience performing blacksmith duties" as reflected in the job posting. (Docket No. 31-1 at page 2).  As discussed above, Tricoli has acknowledged that he did not have one year of experience in several of the duties listed in the job posting and that he had, at best, three months of welding experience. (Docket No. 42-1 at pages 114-115).  The plaintiff argues that a question of fact exists as to whether Tricoli was qualified because Zabawa (and some co-workers) believed him to be qualified, and individuals without welding experience had been appointed to temporary blacksmith positions in the past.  (Docket No. 42-20 at page 5).

The plaintiff does not argue that the duties of the temporary blacksmith, as listed in the job posting, are inaccurate.  Although the plaintiff challenges the amount of time that a temporary blacksmith performs welding tasks, the plaintiff does not dispute that welding is one of the duties which a temporary blacksmith must perform. Moreover, the plaintiff has not placed into dispute the importance of welding in light of the danger to the public if plow blades, wings and other appurtenances were not properly welded on County highway vehicles. The fact that

Zabawa and other co-workers believed that Tricoli met the minimum qualifications for the temporary blacksmith position, does demonstrate that Tricoli actually possessed the experience required pursuant to the job posting. Based upon the evidence in the record, and particularly Zabawa's deposition testimony, it appears that Zabawa considered Tricoli qualified for the position because Tricoli was the most senior MEO, without consideration of prior welding experience or the other specific duties listed on the job posting. This does not create a factual dispute as to whether Tricoli actually met the listed minimum qualifications for the position.

Tricoli's argument, in essence, is not that he met the listed qualifications for the temporary blacksmith position at the time he applied for it, but that he should have been given the opportunity *to become* qualified for the position as others[19] had in the past because he was the most senior candidate.  The plaintiff points to the fact that Glenn was allowed to perform work-out-of-title for 2-3 months just prior to the announcement that Glenn was being appointed to the temporary blacksmith position. Initially, the record reflects that as of the time he applied for the temporary blacksmith position, Glenn already had more than 2 years experience in welding while

_____

[19]   The plaintiff argues that the minimum qualifications listed in the job posting did not have to be met to be appointed to the temporary position, but that the temporary position was to train for the permanent blacksmith position. (Docket No. 42-20 at page 6). This assertion is contrary to the language of the posting and offers no explanation as to why the qualifications would have been included in the posting for the temporary position. The plaintiff points only to Russ Hawley (spelled Holly in the deposition transcripts), as having been appointed to the temporary blacksmith position without any welding experience. (Docket No. 42-20 at page 7). According to Tricoli, Hawley was appointed to the temporary blacksmith position only a year earlier, in 2007, and it was Hawley's relinquishment of the position which created the vacancy in 2008. (Docket No. 42-1 at page 105-106).  The record does not reflect the pool of candidates that applied for the temporary blacksmith position awarded to Hawley. While the record does not reflect the reasons for Hawley's departure from the position, the fact that one individual, who apparently lasted approximately one year in the job, was appointed to the temporary blacksmith position without welding experience is not a compelling argument that such experience was not an important qualification for the position.

working at Terry Young's Auto and Delta Sonic, in addition to the experience he obtained as an

MEO.  Further, Glenn testified that Ron Broska, the general foreman of the East Aurora location,

requested that Glenn perform the out-of-title work because Glenn was interested in doing it.

(Docket No.  42-3 at page 29).  There is no evidence in the record suggesting that Zawodzinski,

who was apparently responsible for deciding who was to get the temporary blacksmith

appointment, was involved in Glenn being allowed to perform the out-of-title work. In any event,

2 to 3 months of additional experience working out-of-title with the blacksmith would not have

brought Tricoli up to the minimum qualifications as listed in the job posting.

Further, Tricoli argues that Glenn also failed to meet every qualification listed in the job

posting. (Docket No. 42-20 at page 7).  In addition to the fact that Glenn had more than two years

of welding experience, considerably more than Tricoli, the record (particularly Glenn's unrefuted

deposition testimony as to his experience) demonstrates that he substantially satisfied the

minimum qualifications. (Docket No. 42-3 at pages 13, 62-63).  See Price v. Fed. Express Corp.,

283 F.3d 715, 722–24 (5th Cir.2002) (finding that even though the selected candidate did not

technically meet the job requirements, his qualifications could be considered to have reasonably

satisfied the requirements); Bauman v. United Healthcare Servs., Inc., 2009 WL 5178022, at *4

(S.D.Tex. Dec. 30, 2009) ("That Defendant hired persons who did not meet all of the listed

requirements in its job postings does not create a material fact issue of pretext.").[20]

---

[20]   The plaintiff cites to a Vermont state court case, Robertson v. Mylan Laboratories, Inc., 176 Vt. 356 (Vt. 2004) for the proposition that the plaintiff need not meet all the minimum qualifications to be "qualified" for the position at issue. In that case, the position at issue required a Ph.D., which the plaintiff did not have, but was close to obtaining. The court held that this was sufficient for the plaintiff to be considered "qualified" inasmuch as she was performing the nearest comparable job. Robertson, 176 Vt. At 368. The Court notes that Robertson did not involve the ADEA and is not controlling authority. In any event, Robertson is factually

Finally, the plaintiff argues that there is direct evidence of age discrimination in this case. The plaintiff points to the remarks allegedly made by Zawodzinski during the conversation in the barn area and during other alleged conversations with Bevilacqua, to the effect that Zawodzinski did not want to appoint Tricoli to the position because Tricoli was too close to retirement and that Tricoli was too old to perform the physical work demanded by the temporary blacksmith position.  (Docket No. 42-20 at page 2).[21]  However, the Second Circuit has held that "the step at which the court considers such evidence is important. A plaintiff can rebut the employer's proffered legitimate, non-discriminatory reason by proving that discrimination played a role in the employer's decision, but no amount of evidence permits a plaintiff to overcome a failure to make out a *prima facie* case." Ruiz v. County of Rockland, 609 F.3d 486, 493 (2d Cir.2010). See also Alward v. Connecticut Dept. of Public Safety, 2011 WL 4572945 (D.Conn. 2011)(summary judgment granted where plaintiff could not establish that she was qualified for

---

distinguishable. In that case, the employer pharmaceutical company created a new title, Supervisor of Drug Delivery, as part of a corporate restructuring. The plaintiff claimed that the responsibilities of the Supervisor of Drug Delivery position were not substantially changed from her old position as Manager of Formulations, but that the employer merely changed the title and added the Ph.D. qualification to give the job to a hand-picked male candidate. The Court found that the plaintiff's job duties as Manager of Permeations and Head of the Formulations Group for a pharmaceutical company were the nearest comparable to the newly created position. In the instant case, there is no evidence of any attempt to manipulate the titles in such a manner. Further, the record reflects that the primary responsibilities of an MEO, operating various highway vehicles, are not comparable to the duties of a blacksmith.

[21]   The plaintiff suggests that because he can demonstrate *direct* evidence of discrimination, the burdens of proof set forth in McDonnell Douglas need not apply, citing to Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564 (2d. Cir. 1989). (Docket No. 42-20 at page 2).  The Court notes that Grant, was decided prior to Gross and applied the "substantial role" test (as opposed to the "but for" test as mandated in Gross) and therefore, may not be good law. In any event, nothing in Grant states that a plaintiff seeking to assert an ADEA claim is relieved from the burden of establishing that he is qualified for the position he was seeking as the basis of his claim.

the position, citing language from <u>Ruiz</u>).

The plaintiff has not established that he was qualified for the temporary blacksmith position, and thus, cannot establish a *prima facie* case under the ADEA.  In light of this finding, the Court will not address whether the defendants have articulated a legitimate, non-discriminatory reason for not appointing the plaintiff to the temporary blacksmith position; or whether a question of fact exists as to the plaintiff's claim that he would have been appointed to the temporary blacksmith position "but for" his age.  The Court also need not reach the defendant's argument that the plaintiff cannot maintain a claim for emotional distress and punitive damages under the ADEA.

### Conclusion

Based on the above, it is recommended that the defendants' motion for summary judgment be GRANTED.

Pursuant to 28 U.S.C.  §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen(14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as W.D.N.Y.  Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME,  OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER**

**BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.**  Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and W.D.N.Y.  Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y.  Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 72.3(a)(3)may result in the District Court's refusal to consider the objection.**

So Ordered.


_/s/ Hugh B. Scott_
United States Magistrate Judge
Western District of New York

Buffalo, New York
February 13, 2014

23